LAW OFFICES

# Joel S. Walter and Associates, P.C.
## Joel S. Walter, Esq.

225 BROADWAY, SUITE 1605
NEW YORK, NY 10007
212-566-3900

TELECOPIER: 212-566-6699
E-mail: cdarrowj@gmail.com

OF COUNSEL
ROBERT A. BOLAND, ESQ.*
*Admitted in New York & Georgia
SANDRA R. SCHIFF, ESQ.
MICHAEL H. SOROKA, ESQ.

August 21, 2008

Honorable Shira Scheindlin
U.S District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: USA v. Morningstar Raindance
       08 CR 116 -01 (SAS)
       **Request for Adjournment of Sentence**

Dear Judge Scheindlin:

    Enclosed, please find the defendant's Sentencing Memorandum regarding the above case.

    Thank you for your consideration.

                          Respectfully submitted,

                          Joel S. Walter & Associates, P.C.

                  By: _____
                          Joel S. Walter, Esq.

JSW/nt
Enc.
c:    AUSA Benjamin Naftalis
      U.S. Probation Officer Thomas McCarthy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA

                SENTENCING MEMORANDUM
                08 CR 116-01 (SAS)

      V.

                HON. SHIRA A. SCHEINDLIN

MORNINGSTAR RAINDANCE
-----------------------------------------------------------X

## BACKGROUND

Morningstar Raindance is scheduled for sentencing following a plea of guilty on February 11, 2008 to Conspiracy to Distribute and Possess with Intent to Distribute Hashish in violation of 21 USC 846. Ms. Raindance is scheduled to be sentenced September 2, 2008 by the Hon. Shira A. Scheindlin.

## COURT'S SENTENCING POWER POST BOOKER/FANFAN

This court has unprecedented level of discretion to use when determining an appropriate sentence for Ms. Raindance. The case law directs the court to give renewed significance to the factors found under 18 U.S.C. 3553(a). The court is no longer bound by the Sentencing Guidelines or the policy statements presented in those guidelines. In the appropriate case, the court can look to the real conduct of an individual and carefully analyze all evidence and circumstances that should be considered, not only that eveidence the guidelines call attention to.

1. **Other factors in 18 U.S.C. 3553 are of equal or greater significance than the Sentencing Guidelines.**

The remedial majority in Booker struck those portions of the Sentencing Reform

Act that made the application of the sentencing range, computed using the Sentencing Guidelines mandatory. In so doing, the Supreme Court rendered the Sentencing Guidelines advisory. In U.S. v. Crosby, 397 F.3d 103 (2nd Cir. 2004), the Second Circuit recognizes the increased significance of section 3553(a) factors:

> and keeping in mind 18 U.S.C. 3553(a)(6) which sets forth "the need to avoid unwarranted sentencing disparities among defendant's with similar records who have been found guilty of similar conduct" the "Prior to Booker/Fanfan the section 3553(a) requirement that the sentencing judge 'consider' all of the factors enumerated in that section had uncertain import because subsection 3553(b)(1) required judges to select a sentence within the guidelines range unless the statutory standard for departure was met. Now, with the mandatory duty to apply the guidelines excised, the duty imposed by section 3553(a) to "consider" numerous factors acquires renewed significance." Crosby, 397 F.3d 103 (2nd Cir. 2004).

Post Booker, courts must treat the guidelines as just one of a number of sentencing factors, being mindful that the primary goal of the sentencing guidelines is, as set forth in 18 U.S.C. 3553(a)(6), to address "the need to avoid unwarranted sentence disparities among defendant's with similar records who have been found guilty of similar conduct". In light of recent case law developments, there remains no legal basis to give any more or less deference to the Sentencing Guidelines as just one factor in the overall analysis pursuant to 18 U.S.C 3553(a). More importantly, the basic tenet of the guidelines as set forth in Section 3553(a) is that, "The court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection". (Emphasis added) Section 3553(a)(2) states that such purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In the past, the court may have been limited in applying a departure based on the policy statements under the guidelines. Under the new advisory system, a "judge who has considered the policy statements concerning departures, need not definitively resolve such questions if the judge has fairly decided to impose a non-guidelines sentence." U.S. v. Crosby, supra. The court, in the appropriate case, can and should now consider factors the guidelines previously discouraged. (U.S.S.G. §5H et seq.) Even if those factors are not present to the exceptional standards once required by the guidelines, the court now must consider a lower sentence if appropriately based on those factors. The court is no longer limited by the "zones" in the guidelines. If a sentence of time served is appropriate, regardless of the advisory guidelines the court has the ability to fashion a sentence that recognizes the "real conduct" of an offense. This approach should not lead to inappropriate sentence disparity; rather, individual justice can be distributed in the appropriate case.

Recently the United States Supreme Court in United States v. Gall, 128 S. Ct. 586 (2007), has in effect given back to the federal judiciary the broad discretion they appropriately enjoyed before the enactment of the sentencing guidelines. In Gall, the defendant pleaded guilty to conspiracy to distribute the controlled substance "ecstasy". The presentence report recommended a sentence of (30) to (37) months in prison and the Court sentenced the defendant to (3) years probation. Ultimately, the Supreme Court found that the sentence was justified based on the Court's application and analysis of the § 3553(a) factors, and the court rejected an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range.

In the instant case, as in <u>Gall</u>, the application of the § 3553(a) factors would justify the imposition of a less severe non-guideline sentence.

### DEFENDANT HISTORY AND CHARACTERISTICS

Morningstar Raindance, 58 years old, is undoubtedly the most atypical, unique client I have ever represented. She has single handedly raised three children, Andromeda, 31, a licensed Practical nurse (the defendant's family disowned her when Andromeda was born out of wedlock), Orion 23, and Alpha 28 who suffers from bi-polar disease (see reports) about which I will discuss later. Additionally she cares for her grandson Travis, who also suffers from bi-polar disease (see reports) when Andromeda is working. Undoubtedly, Alpha and Travis, would have to be institutionalized were Morningstar to be incarcerated (Alpha was completely unmanageable during the two months Morningstar was incarcerated in 2004 due to a marijuana conviction). It is respectfully submitted, even though the Probation Department is recommending a sentence of 366 days that a sentence of strict house arrest supervision and community service (which she now performs on a daily basis) would serve the goals of the sentencing guidelines. Ms. Raindance is almost childlike in her affect, cares and lives her life, for everyone with whom she comes into contact, never angry nor using profanity and deeply religious (Buddhism). She changed her name to Morningstar Raindance after living near a Hopi Indian Reservation and she has dedicated her life to helping others.

Due to an accident in 1983 (records already submitted) which resulted in a two month hospitalization and near death (she was on a respirator for some time), she suffers permanent brain damage (see records from Maverick Family Health) and a loss of cognitive functioning. A few days after her pre-sentence interview, she called me and

4

asked when the interview was going to occur. Despite her physical and mental disabilities (see hospital records), she has managed to hold her family together, foremost in the care of her son Alpha (taking him to anger management class and ensuring that he takes his medication) and grandson Travis, as well as becoming the "angel" of Woodstock, assisting those who need food, shelter and clothing. Without her presence, despite the Probation Department's conclusion, her son, grandson and the people of Woodstock would suffer deeply. Alpha responds to her gentleness, persistence and kindness, as does Travis. She has never taken this position before.

While the defendant has a criminal record, it revolves around marijuana, an illegal substance and while she has occasionally used marijuana herself, she has stopped using as her post-arrest testing attests. She advises that she has learned her lesson and will never become involved again either selling or using marijuana or hashish.

## EMPLOYMENT

Ms. Raindance had a few part time jobs, however, since her near fatal accident in 1983 she has basically been unemployed. She worked as a janitor at Woodstock Children's Center in exchange for the right to have her children attend tuition free. She receives $724 a month SSI (see letter: "Chronic brain syndrome") which leaves her a monthly shortfall of $76.00 which is covered by her son Orion.

As a result of the settlement she received from the 1983 accident, she was able to purchase a small plot of land upon which she was able to built a modest house ("shack" as it is accurately referred to in the pre-sentence report) and the photographs herein attest to the "modesty" of her style of life. Also on this property is Orion's "modest home" and a converted school bus (see photo) in which Alpha lives.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

Morningstar Raindance opened Post Office boxes while working for John Paul Giraud and picked up packages of hashish delivered to these boxes. She then gave the packages to Mr. Giraud who paid her for the deliveries. While Ms. Raindance fully and completely accepts responsibility for her criminal actions, it should be pointed out that this conspiracy was headed by Mr. Giraud who was sentenced on June 10, 2008 by the Hon. Naomi Buchwald to one year probation and two months home detention. As the commercial goes, "In life, there are passengers and there are drivers." In this conspiracy, Mr. Giraud, a wealthy businessman with homes in Ulster County and New York City was definitely the driver. As to payment, one look at my client's home should speak volumes. Any extra dollars she received from Mr. Giraud, she gave to those she considered less fortunate.

## LETTERS

Family, friends and acquaintances have written the Court on Ms. Raindance's behalf and a constant theme is one of kindness and decency and character. Naturally, hashish aside, they all plead for mercy for a person who spends her days helping her family and anyone in need (see letters). These letters are from: Andromeda Raindance; Thomas R. Siblo-Landsman; James Romero; Enrique Noguere; Sarah Crane; Rachael Parkers; Bernie Lynn Phasis; Glenn Gill; Christopher James; Shalter Eden; Carolyn DaConcercao; Sebastian Shepard; Dennis G. Yusko; Sue Altier; Victori Sullivan; Star Nigro; Zoe Hirsch; Abigail and Daniel Eggnin; Bruce Brownswell; Joseph Trusso; Peto Rose; Thomas Miller and David Clegg, Esq. Additionally please find a fax from Mike Grovano from the SSA – Ms. Raindance receives $724.00 monthly "on the basis of her

diagnosis of: Organic Mental Disorders (Chronic Brain Syndrome)" and a note from Dr. Rissman, describing how my client's presence in the home is "mandatory for "Alpha's" future well-being".

## CONCLUSION

Ms. Raindance is a decent individual who loves her family and extended family and others love her generosity and caring. She never thinks in term of "me" but rather "them." She <u>always</u> puts the interests of others before that of her own.

No doubt Ms. Raindance committed a serious offense, however, she advised that she can no longer be involved with marijuana or hashish even if that would bring her a few more dollars with which to help others. She poses a zero threat to society and she is extremely necessary for the well being of her family and community. While, in some respects, she is frozen in time to 1983, she continues, like a trooper, to do the very best she can.

For the reasons cited herein, I would respectfully request that the Court find that the Probation Department's request for a 366 day sentence is unreasonably harsh. I request that the Court impose a sentence of house arrest and community service for the ends of justice to have been served.

Dated: New York, New York
       August 21, 2008

Respectfully submitted,

*[signature]*

JOEL S. WALTER & ASSOCIATES, P. C.
By: JOEL S. WALTER, ESQ.
Attorney for Defendant
225 Broadway, Suite 1605
Brooklyn, New York 10007

To:    United States Attorney's Office
       One Saint Andrew's Plaza
       New York, NY 10007
       **AUSA Benjamin A. Naftalis**

       U. S. Department of Probation
       233 Broadway
       New York, New York 10007
       **Attention: Thomas McCarthy**
       **United States Probation Officer**

8